754 So.2d 657 (2000)
Terry Melvin SIMS, Appellant,
v.
STATE of Florida, Appellee.
Terry Melvin Sims, Petitioner,
v.
Michael Moore, Respondent.
Nos. SC00-295, SC00-297.
Supreme Court of Florida.
February 16, 2000.
*658 Richard Jorandby, Public Defender, and Steven H. Malone, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida; and Mark E. Olive and Timothy P. Schardl, Special Assistant Public Defenders, Law Offices of Mark E. Olive, P.A., Tallahassee, Florida, for Appellant/Petitioner.
Robert A. Butterworth, Attorney General, and Judy Taylor Rush and Kenneth S. Nunnelley, Assistant Attorneys General, Daytona Beach, Florida, for Appellee/Respondent.
PER CURIAM.
Terry Melvin Sims, under sentence of death and warrant for execution, appeals the trial court's denial of his emergency motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the trial court's order denying postconviction relief and we deny Sims' application to this Court for relief by habeas corpus.

PROCEDURAL BACKGROUND
Sims was convicted of first-degree murder and robbery for the 1977 fatal shooting of George Pfeil during a drugstore robbery.[1] His conviction and sentence were affirmed on appeal. See Sims v. State, 444 So.2d 922 (Fla.1983), cert. denied, 467 U.S. 1246, 104 S.Ct. 3525, 82 L.Ed.2d 832 (1984). Sims then filed a postconviction motion in circuit court, which was denied following an evidentiary hearing. This Court affirmed the denial of the postconviction motion. See Sims v. State, 602 So.2d 1253 (Fla.1992), cert. denied, 506 U.S. 1065, 113 S.Ct. 1010, 122 L.Ed.2d 158 (1993).
Sims subsequently filed a petition for habeas corpus in this Court, which was *659 denied. See Sims v. Singletary, 622 So.2d 980 (Fla.1993). Sims filed a federal petition for habeas corpus in the U.S. District Court for the Middle District of Florida, which was denied as to Sims' conviction, but granted as to his sentence. See Sims v. Singletary, No. 93-1055-CIV-ORL-22 (M.D.Fla. Aug. 22, 1997). On appeal, the Eleventh Circuit Court of Appeals affirmed the district court's decision as to conviction, but reversed the district court's grant of relief as to sentencing. See Sims v. Singletary, 155 F.3d 1297 (11th Cir. 1998), cert. denied, 527 U.S. 1025, 119 S.Ct. 2373, 144 L.Ed.2d 777 (1999). The Governor signed Sims' death warrant on September 23, 1999.
On September 28-29, Sims sought disclosure of public records pursuant to rule 3.852(h)(3) of the Florida Rules of Criminal Procedure. The trial court denied Sims' motion to compel production of records, and this Court affirmed. See Sims v. State, No. 96,731 (Fla. order filed Oct. 21, 1999); Sims v. State, No. 96,731 (Fla. Feb. 8, 2000). Sims subsequently filed a second motion for postconviction relief, which the trial court denied following an evidentiary hearing. This Court affirmed the denial of postconviction relief. See Sims v. State, 750 So.2d 622 (Fla.1999).[2]
The Governor reissued Sims' death warrant on January 26, 2000, and scheduled execution for February 23, 2000. Sims filed a third 3.850 motion in circuit court.[3] In that motion, Sims argued that newly discovered evidence establishes his innocence. He also challenged the retroactive application of the recent legislative change to execution by lethal injection and the constitutionality of lethal injection. The trial court held an evidentiary hearing on Sims' claims on February 9 and 10, and ultimately denied relief on February 12, 2000. This appeal follows.

3.850 MOTION FOR POSTCONVICTION RELIEF

Newly Discovered Evidence
Sims' first claim on appeal is that newly discovered evidence establishes his innocence and the guilt of another man, Terry Wayne Gayle. At the evidentiary hearing, the defense admitted four affidavits in relation to the newly discovered evidence claim. Pursuant to stipulation, these affidavits were admitted in lieu of live testimony. The first affidavit is that of Joyce Gray, who at the time of trial was the common law wife of Curtis Baldree, one of the co-felons who testified against Sims during the trial.[4] She provided several statements Baldree had allegedly made concerning Sims' involvement in the homicide. The first occurred sometime in 1981 when Baldree purportedly told her that "he has no choice but to lie-that Sims had nothing to do with it." Gray stated that Baldree admitted to her that "he had to lie to protect himself and the others that were actually involved." Another statement allegedly occurred at a Famous Amos restaurant in Jacksonville, where Baldree was accused by a man named Jerry Lawrence *660 of "snitching" on someone who was not involved in the Longwood robbery. According to Gray, Baldree responded that "he did what he had to do." Finally, Gray stated that she met Terry Gayle on January 12, 1978. She claims that when Gayle learned that Baldree had been arrested for a "murder and armed robbery," Gayle stated "it must be the Longwood job." B.B. Halsell, another co-felon who testified against Sims, was present at the time of Gayle's statement. He whispered to Gayle and nothing more was said.
The second affidavit was prepared by Steven Scott Milliken, Gail Milliken's son. Gail Milliken, now deceased, was B.B. Halsell's girlfriend at the time of Sims' trial. Her son, now age twenty-five, claims that his mother made the following statements: that B.B. Halsell had accidently shot her in an attempt to shoot Sims when he discovered her and Sims having sex, that Terry Sims was on death row for something he did not do, and that Terry Gayle told her that he, not Sims, committed the murder.
The remaining two affidavits are from attorneys in Georgia who found Gray and obtained her statements. These affidavits were offered merely to explain why Gray's testimony constituted newly discovered evidence.
It is well established that "in order to be considered newly discovered, the evidence `must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that the defendant or his counsel could not have known [of it] by the use of due diligence.'" Jones v. State, 709 So.2d 512, 521 (Fla.1998) (quoting Torres-Arboleda v. Dugger, 636 So.2d 1321, 1324-25 (Fla. 1994)); Robinson v. State, 707 So.2d 688, 691 (Fla.1998); Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997). Second, to warrant relief, "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." Jones v. State, 591 So.2d 911, 915 (Fla.1991); see also State v. Spaziano, 692 So.2d 174, 176 (Fla.1997). In making this determination, the trial court must "`consider all newly discovered evidence which would be admissible' at trial and then evaluate `the weight of both the newly discovered evidence and the evidence which was introduced at trial.'" Jones, 709 So.2d at 521 (quoting Jones, 591 So.2d at 916). Assuming the defendant's evidence meets the threshold requirement by qualifying as newly discovered, no relief is warranted if the evidence would not be admissible at trial. See Robinson, 707 So.2d at 691-92 (denying relief where statements made in affidavit did not expose affiant to criminal liability for perjury and lacked indicia of reliability for admission as statement against penal interest).
Here, the trial court accepted the defense's argument that the affidavits of Gray and Milliken constituted newly discovered evidence. However, the court ruled that the affidavits would be inadmissible, and therefore, they "would not result in a different verdict upon retrial." Further, as to Gray's affidavit, the court reasoned that Baldree's alleged "statements are hearsay, lack credibility and trustworthiness and are inadmissible in evidence." As for Milliken's affidavit, the trial court reasoned that the alleged statements contained therein are "either expressions of opinion without foundation or are hearsay. In either case, they lack trustworthiness and are inadmissible in evidence."[5]
We agree with the trial court's conclusion that Milliken's testimony is inadmissible because it consists of double hearsay and would not be admitted under any legal grounds. Notwithstanding, Sims argues that the remaining newly discovered evidence he has produced during the instant proceedings would be admissible on retrial as (1) an admission by a party opponent; (2) impeachment evidence of Baldree's trial testimony; and (3) a statement *661 against interest. He further argues that the evidence would be admissible under Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), despite its hearsay nature. We reject Sims' first ground (an admission by party opponent) and fourth ground (Chambers v. Mississippi argument) as being without merit.[6] His remaining two bases for admission, however, deserve analysis.
Section 90.804(2) provides several exceptions to the hearsay rule, one of which is for statements against interest:
(c) Statement against interestA statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.

§ 90.804(2)(c), Fla. Stat. (1999) (emphasis added). Contrary to Sims' posture on appeal, we find no error in the trial court's resolution of this claim. Like the trial court, we do not find that sufficient evidence exists to corroborate Baldree's alleged statements contained in the Gray affidavit. As noted above, according to Gray, when Baldree was confronted by Jerry Lawrence about "snitching," Baldree allegedly responded that "he did what he had to." As corroborating evidence, Sims points to Jerry Lawrence's affidavit, wherein Lawrence claims that when he confronted Baldree about "snitching" on someone who was not present at the crime, Baldree merely shrugged his shoulders. While the affidavits apparently describe the same conversation, neither account is specific and neither Sims' nor Gayle's names were mentioned. Further, Lawrence did not provide any statements by Baldree upon being confronted. All of the other evidence in the prior proceedings and produced to date relate solely to Halsell's statements.
Accordingly, even though Baldree is unavailable and his statements appear to be against his interest, we find no error in the trial court's determination that they have not been sufficiently corroborated by any other evidence and thus lack the indicia of trustworthiness to be admitted as substantive evidence under section 90.804(2)(c). See Jackson v. State, 421 So.2d 15, 17 n. 7 (Fla. 3d DCA 1982) (finding no error in exclusion of hearsay testimony that another person had admitted committing crime of which Jackson was accused because defense *662 did not proffer "corroborating circumstances [to] show the trustworthiness of the statement" as is required to justify admissibility under section 90.804(2)(c)); cf. Ards v. State, 458 So.2d 379, 380 (Fla. 5th DCA 1984) (holding that evidence that another person admitted to committing the crime for which Ards was charged was inadmissible under section 90.804(2)(c) because the corroborating circumstances "were ambiguous, unreliable and not trustworthy"). Thus, we find no error with the trial court's ruling on the substantive nature of the evidence.
Notwithstanding, Sims argues that the newly discovered evidence would still be admissible as impeachment evidence. See Jones, 709 So.2d at 521 (noting that once the trial court determines the evidence's admissibility, it must evaluate the weight of the evidence by determining "whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence"); McDonald v. Pickens, 544 So.2d 261, 264 (Fla. 1st DCA 1989) ("[T]here may be cases where newly discovered evidence may warrant a new trial notwithstanding that the evidence goes only to the impeachment of a witness."). Assuming the evidence is admissible for limited impeachment purposes, the next step would be to consider the newly discovered evidence in conjunction with the newly discovered evidence at the prior proceedings and then compare it with the evidence introduced at trial. See Jones, 709 So.2d at 522. In Lightbourne v. State, 742 So.2d 238 (Fla.1999), we explained that "[t]his cumulative analysis must be conducted so that the trial court has a `total picture' of the case. Such an analysis is similar to the cumulative analysis that must be conducted when considering the materiality prong of a Brady claim." Id. at 247-48 (citing Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). However, even if this evidence were admissible for the limited purpose of impeachment we would find any error by the trial court to be harmless.
We initially note that despite the alleged newly discovered evidence presented in the instant appeal, Sims' present claim is essentially the same claim that the trial court and this Court considered and rejected in Sims' prior postconviction proceeding and appeal during the fall of 1999. See Sims, 750 So.2d at 623-24. The newly discovered impeachment evidence adds little to the claim. The newly discovered evidence previously presented consists of a document indicating Terry Gayle purchased lock-pullers at or near the time of the murder (1989 postconviction proceeding);[7] statements by Halsell to Jerry Lawrence and Harold Bryan that Sims was not involved in the murder (1999 postconviction proceeding);[8] evidence that Terry Gayle and Halsell were very close and that Gayle had committed drugstore robberies with Halsell up to six weeks before the murder (1999 postconviction proceedings).[9] This prior evidence is now supplemented by statements by Baldree to Joyce Gray that Sims was not involved in the drugstore robbery and murder, which, at most, could be considered limited impeachment evidence.
After considering Sims' new evidence, we find that none of the evidence introduced to date places Gayle at the scene of the murder or otherwise establishes the probability that Sims would be acquitted. At most, Sims'"newly discovered evidence" throughout the course of this case could be used to impeach Baldree and Halsell's trial testimony. It does not affect the testimony by the three eyewitnesses who identified Sims as the perpetrator.
Further, the defense has presented no postconviction evidence to directly refute the State's case against Sims or the improbability *663 of mere coincidence of the fact that both Sims and whoever did the killing sustained injuries to the same area of the body, a fact that was supported by competent, substantial evidence. While the fact that an innocent person may have been found guilty of a crime he did not commit is always troubling, we also agree with the trial court that it is somewhat suspect that this evidence of "innocence" has not surfaced before now. Both Gail Milliken and Joyce Gray testified on behalf of the defense during Sims' trial and thus are not strangers to this case. After considering the newly discovered evidence admitted in this and in prior proceedings in this case in conjunction with the evidence submitted at trial, we find no error in the trial court's conclusion that the cumulative evidence presented is insufficient to warrant a new trial. Accordingly, we affirm the trial court's denial of this claim.

Retroactive Application of Lethal Injection
Sims raises several arguments[10] pertaining to the recent legislative amendments to the method of execution statute.[11] First, he claims that the amended law cannot be retroactively applied to him because he was expressly sentenced to be executed by electrocution; he was not sentenced to die by lethal injection and he was not sentenced to be executed by a choice of methods.[12] He claims therefore, that under *664 the Ex Post Facto clauses of the state and federal constitutions and under article X, section 9 of Florida's constitution, the new law may not be applied to him for a crime that was committed prior to the law's enactment. We disagree.
The United States Supreme Court has held that changes in criminal statutes which do not alter the definition of the crime of which the defendant was convicted or make the punishment more burdensome are not ex post facto. See Collins v. Youngblood, 497 U.S. 37, 52, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). In Malloy v. South Carolina, 237 U.S. 180, 35 S.Ct. 507, 59 L.Ed. 905 (1915), the United States Supreme Court held that procedural changes in the method of execution did not constitute an ex post facto law even if applied to offenses committed prior to such law's enactment. See id. at 185, 35 S.Ct. 507.[13] The Court reasoned that:
The statute under consideration did not change the penaltydeathfor murder, but only the mode of producing this together with certain non-essential details in respect of surroundings. The punishment was not increased and some of the odious features incident to the old method were abated.
Id. at 185, 35 S.Ct. 507. Accordingly, the Court held that the amended law would not violate the Ex Post Facto Clause, even though the defendant committed the crime prior to the passage of the new law. See id. at 185, 35 S.Ct. 507.[14]
In this case, we find that the Legislature intended to apply the new law retroactively to persons already under sentence of death. However, we do not believe that retroactive application of the new law would violate Sims' constitutional rights *665 under the Ex Post Facto clause. The new law does not affect the penalty for first-degree murder, which has remained the same (i.e., death). Further, the legislative switch to lethal injection merely changes the manner of imposing the sentence of death to a method that is arguably more humane. The fact that the new law gives inmates the option of choosing the method of execution does not, we believe, violate any constitutional rights of the prisoner under sentence of death. See Poland, 117 F.3d at 1105. Thus, we conclude that the retroactive application of the legislative changes to the statute to persons already under sentence of death does not violate the Ex Post Facto clauses of the state and federal constitution.
Sims' argument that our decision in Washington v. Dowling, 92 Fla. 601, 109 So. 588 (1926), prohibits retroactive application of a change in the method of execution is misplaced.[15]Dowling is factually distinguishable from the instant case. There, the Legislature altered the method of execution by repealing hanging and replacing it with electrocution. The new law did not preserve a method of execution for those prisoners who had been sentenced under the former law and the new law did not give prisoners the option of electing a method of execution. The new law involved herein, on the other hand, does retain for prisoners like Sims the option of death by electrocution. In short, this Court in Dowling was not presented with the type of legislative changes at issue in the instant case. Dowling, therefore, is inapposite.

Denial of Full and Fair Evidentiary Hearing
Next Sims argues that he was deprived of a full and fair hearing on his postconviction motion because of the hurried nature of the proceedings and the State's failure to disclose the execution procedures or the chemicals to be used in administering the lethal injection.
This claim is without merit. The record reveals that Sims obtained a copy of the "Execution Day Procedures" created by the Florida Department of Corrections (DOC) on January 28, 2000.[16] The record also indicates that the DOC disclosed to Sims on February 7, 2000 the chemicals to be used during the execution. At the evidentiary hearing, the State presented three witnesses from the DOC who provided specific details about the chemicals to be administered and the procedure for carrying out the execution.[17] Sims' attorney *666 had full and fair opportunity to question these witnesses about their knowledge of the procedure and their respective roles in administering the lethal injection. Finally, the record reflects that the trial court set aside several days for the hearing and gave the defense considerable latitude in presenting witnesses. Accordingly, we find no error with the manner in which the proceedings below were conducted.

Cruel and Unusual Punishment
In his final claim on appeal, Sims contends that lethal injection constitutes cruel and unusual punishment under the Eighth Amendment to the Constitution. Despite the numerous challenges to this claim,[18] Sims' arguments can be broken down into two categories: first, the DOC's execution day protocol fails to provide sufficient details and procedures for administering lethal injection and second, the new law violates the Separation of Powers clause in the Florida Constitution because it improperly delegates legislative power to an administrative agency.
As for the first, a similar challenge was raised and rejected by the United States District Court for Arizona in LaGrand v. Lewis, 883 F.Supp. 469 (D.Ariz.1995), aff'd, 133 F.3d 1253 (9th Cir.1998). There, the court reasoned as follows:
Petitioners heavily rely on the affidavit of John Davis Palmer, Ph.D., M.D., to establish the proposition that the administration *667 of the three drugs utilized in Arizona is fraught with a substantial risk of pain to the condemned. Dr. Palmer reviewed the written Internal Management Procedures ("IMP's") of the Arizona State Prison Complex at Florence ("ASPC-Florence") relating to executions and concluded that the lack of specific guidelines controlling the dosage, sequence and delivery rate exposes the condemned to a risk that the drugs will not be administered properly, and an improper procedure could cause the condemned to feel great pain. The written instructions also do not prescribe a level of training for the "consultants," who apparently carry out the execution. Dr. Palmer concludes that the severe infliction of pain could result from repeated attempts to insert the intravenous catheter into the condemned's veins. He also points out that if the catheter is not inserted in a vein, the drugs would be injected into the muscle tissue, producing a much slower rate of absorption.
While the relevant IMP's do not make explicit the exact protocol utilized by Arizona, they clearly indicate that executions are to be conducted under the direction of the ASPC-Florence Facility Health Administrator, knowledgeable personnel are to be used, and that the presence of a physician is required. The physician is to monitor the condemned's vital signs, record the time of execution, the time of cardiac arrest, and issue an unofficial time of death. The Court finds that the written procedures are not constitutionally infirm simply because they fail to specify in explicit detail the execution protocol. Petitioners' argument challenging the procedural safeguards is based entirely on speculation. The eye-witness reports of the executions of the two Arizona inmates who have been executed by this method support the finding that the condemned lose consciousness within seconds, and death occurs with minimal pain within one to two minutes. The Court also notes in passing that petitioners' argument that physicians and nurses would violate professional ethical norms in assisting in executions has no impact on the constitutionality of this method of execution. The Court therefore concludes that petitioners have not carried their burden of showing that the challenged method exposes them to more than a negligible risk of being subjected to a cruel and wanton infliction of pain.
Id. at 470-71.
Here, Sims raises a similar challenge to the sufficiency of the DOC's written protocol. In support of his argument, Sims relies on testimony by Professor Michael Radelet and Dr. Joseph Lipman, both of whom testified at the hearing below. Both experts provided examples of what could happen if the lethal injection is not administered properly. Professor Radelet offered specific examples of "botched" executions throughout the country.[19] After *668 considering the testimony presented by the witnesses from the DOC and the defense's experts on lethal injection, the trial court ruled that "the manner and method of execution to be carried out by lethal injection in Florida is neither cruel nor unusual and that the Department of Corrections is both capable and prepared to carry out executions in a manner consistent with evolving standards of decency."
We find no error in the trial court's analysis and conclusion. Sims' reliance on Professor Radelet and Dr. Lipman's testimony concerning the list of horribles that could happen if a mishap occurs during the execution does not sufficiently demonstrate that the procedures currently in place are not adequate to accomplish the intended result in a painless manner. Other than demonstrating a failure to reduce every aspect of the procedure to writing, Sims has not shown that the DOC procedures will subject him to pain or degradation if carried out as planned. Sims' argument centers solely on what may happen if something goes wrong. From our review of the record, we find that the DOC has established procedures to be followed in administering the lethal injection and we rely on the accuracy of the testimony by the DOC personnel who explained such procedures at the hearing below. Thus, we conclude that the procedures for administering the lethal injection as attested do not violate the Eighth Amendment's prohibition against cruel and unusual punishment.[20]

Separation of Powers
We likewise conclude that the new law does not improperly delegate legislative authority to an administrative agency.[21] Generally, the Legislature may not delegate the power to enact a law or the right to exercise unrestricted discretion in applying the law. See B.H. v. State, 645 So.2d 987, 991-92 (Fla.1994); Askew v. Cross Key Waterways, 372 So.2d 913, 924 (Fla.1978); State v. Atlantic Coast Line Railroad Co., 56 Fla. 617, 47 So. 969 (1908). However, the Legislature may "enact a law, complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose." Atlantic Coast Line Railroad Co., 56 Fla. at 636-37, 47 So. at 976.
Other courts have considered the separation of powers argument and rejected the same. See State v. Deputy, 644 A.2d 411 (Del.Super.Ct.1994); State v. Osborn, 102 Idaho 405, 631 P.2d 187 (1981); Ex parte Granviel, 561 S.W.2d 503 (Tex.Crim. App.1978). The Texas court noted:
Despite the general rule against the delegation of the power of general legislation, there are many powers that may be delegated by the Legislature. When the Legislature itself cannot practically *669 or efficiently perform the functions required, it has the authority to designate some agency to carry out the purposes of such legislation. The trend of modern decisions is to uphold such laws.
Generally, a legislative body, after declaring a policy and fixing a primary standard, may delegate to the administrative tribunal or officer power to prescribe details, such as to establish rules, regulations or minimum standards reasonably necessary to carry out the expressed purpose of the act.
Thus, the existence of an area for exercise of discretion by an administrative officer under delegation of authority does not render delegation unlawful where standards formulated for guidance and limited discretion, though general, are capable of reasonable application. So long as the statute is sufficiently complete to accomplish the regulation of the particular matters falling within the Legislature's jurisdiction, the matters of detail that are reasonably necessary for the ultimate application, operation and enforcement of the law may be expressly delegated to the authority charged with the administration of the statute.
. . . .
The Legislature has determined that the penalty for capital murder should be death or life imprisonment. This is within the constitutional power vested in the Legislature to enact laws which include the right to define crimes and the punishment therefor. By the amendment to said Article 43.14, the Legislature changed the mode of execution when the death penalty is imposed. It provided that the new mode of execution shall be by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death. The Legislature placed a time limitation on the date of execution following sentence and provided for the time of day when the execution shall take place and provided the execution procedure was to be determined and then supervised by the Director of the Department of Corrections.
It appears that the Legislature has declared a policy and fixed a primary standard and delegated to the said Director power to determine details so as to carry out the legislative purpose which the Legislature cannot practically or efficiently perform itself. The statute is sufficiently complete to accomplish the regulation of the particular matters falling within the Legislature's jurisdiction.
While the power to determine the validity of a statute rests with the courts, as noted earlier, there is a presumption of validity when such question is to be passed upon. And such presumption obtains until the contrary is shown beyond a reasonable doubt. An act will not be declared unconstitutional unless the Legislature has clearly exceeded its powers. Statutes should not be annulled by the courts merely because doubts may be suggested as to their constitutionality.
561 S.W.2d at 514-15 (citations omitted). We note that most of the states employing lethal injection leave the task of implementing procedures for administering lethal injection to an administrative agency. Unlike Florida, however, some of these states provide a simple legislative definition of lethal injection, such as "the intravenous injection of a substance or substances in a lethal quantity sufficient to cause death." See Ariz.Rev.Stat. Ann. § 13-704(A) (Supp.1998) as an example of one such statute. Several state statutes further specify that the injection must be "continuous" until death is accomplished and that the lethal substance must contain a "lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent." See Ark.Code Ann. § 5-4-617 (Michie 1997).[22]
*670 However, we do not find that the Legislature's failure to define the chemicals to be administered in the lethal injection necessarily renders the statute unconstitutional. First, the statute clearly defines the punishment to be imposed (i.e., death). Thus, the DOC is not given any discretion to define the elements of the crime or the penalty to be imposed. Second, the statute makes clear that the legislative purpose is to impose death. Secretary Moore testified that the purpose of the DOC's execution day procedures were to achieve the legislative purpose "with humane dignity." Third, determining the methodology and the chemicals to be used are matters best left to the Department of Corrections to determine because it has personnel better qualified to make such determinations. Finally, we note that the law in effect prior to the recent amendments stated simply that the death penalty shall be executed by electrocution without stating the precise means, manner or amount of voltage to be applied. Thus, we conclude that the lethal injection statute is not so indefinite as to constitute an improper delegation of legislative power, and the lack of specific details about the chemicals to be used does not violate the Eighth Amendment prohibition against cruel and unusual punishment.[23]

PETITION FOR WRIT OF HABEAS CORPUS
Sims also filed in this Court a petition for writ of habeas corpus urging us to reconsider our 1992 opinion affirming the trial court's denial of Sims' motion for postconviction relief.[24] We reject the claims in Sims' habeas petition and deny the petition without further consideration.

CONCLUSION
In sum, we affirm the trial court's denial of Sims' motion for postconviction relief and deny his petition for habeas corpus. No motion for rehearing will be heard.
It is so ordered.
HARDING, C.J., and SHAW, WELLS, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] The facts in this case have been set forth in our opinion on direct appeal. See Sims v. State, 444 So.2d 922 (Fla.1983).
[2] Sims filed a petition for writ of certiorari in the United States Supreme Court on January 24, 2000. A decision in that case is pending.
[3] The claims include: (1) whether newly discovered evidence demonstrates Sims's innocence; (2) whether the legislative change to lethal injection violates the ex post facto clause and the due process clause of the state and federal constitutions and the savings clause of the Florida Constitution; (3) whether electrocution violates the Eighth Amendment prohibition against cruel and unusual punishment; (4) whether the lethal injection statute violates the state constitution requiring separation of powers and disclosure of public records; and (5) whether lethal injection violates the Eighth Amendment prohibition against cruel and unusual punishment. The trial court granted an evidentiary hearing on claims (1) and (4), but denied an evidentiary hearing on claims (2) and (3).
[4] Gray's affidavit was signed October 24, 1999, but it was not considered by the trial court during the postconviction proceedings at that time because defense counsel did not receive a copy of the affidavit until after the hearing had ended.
[5] In so concluding, the trial court cited to section 90.804(2)(c), Florida Statutes, which discusses the admissibility of statements against penal interest.
[6] Section 90.803(18), Florida Statutes (1999), permits one party to admit an admission against the opposing party in one of four limited circumstances. Under section 90.803(18)(e), a statement by a person who was a coconspirator of the party during the course and in furtherance of the conspiracy is admissible as substantive evidence. However, Baldree was not a party to Sims's trial. He was a witness offered by the state. And there is no evidence that Baldree's statement is being offered in furtherance of a conspiracy. Thus, this section does not apply.

Chambers permitted hearsay evidence of a confession to be admitted as substantive evidence based on the following four factors: (1) each confession was made spontaneously to a close acquaintance shortly after the murder occurred; (2) each confession was corroborated by some other evidence in the case; (3) each confession was self-incriminatory and unquestionably against interest; and (4) if there was any question as to the truthfulness of the statements, the declarant was available for cross-examination. See 410 U.S. at 300-01, 93 S.Ct. 1038. In Jones, this Court recognized that Chambers has since been limited to the specific facts and circumstances in that case because Mississippi evidence law did not permit an exception to the hearsay rules for statements against penal interest. See 709 So.2d at 524-25 (citing Gudinas v. State, 693 So.2d 953 (Fla.1997)). Even if Chambers applies, Sims did not provide sufficient corroborating evidence. Further, the statements were first made in 1981, almost four years after the crime occurred and Baldree is unavailable for cross-examination because he died in 1981. Thus, the statements are not admissible under Chambers.
[7] See Sims v. State, 602 So.2d 1253 (Fla. 1992).
[8] See Sims v. State, 750 So.2d 622 (Fla.1999).
[9] See id.
[10] Sims' claim contains several subissues, all of which relate to the retroactive application of the new law. They include: (1) the choice statute may not be retroactively applied to Sims because he was sentenced to die by electrocution, not lethal injection or a "choice" of methods; (2) the law may not presume that a method of execution has been waived by merely being silent; (3) the lethal injection statute may not be retroactively applied to Sims because to do so would violate article X, section 9 of the Florida Constitution as that provision has been interpreted by this Court in Washington v. Dowling, 92 Fla. 601, 109 So. 588 (1926), and Ex parte Browne, 93 Fla. 332, 111 So. 518 (1927); and (4) the trial court erred in relying on article I, section 17 of the Florida Constitution, as amended in 1998. In light of our holding that the new law may constitutionally apply to Sims, we need not determine the applicability of the 1998 amendments to article I, section 17 of the constitution.
[11] On January 7, 2000, the legislature submitted a bill to Governor Bush for signature. The pertinent portion of the bill stated:

Section 1. Section 922.10, Florida Statutes, is amended to read:
922.10 Execution of death sentence; executioner. A death sentence shall be executed by electrocution or lethal injection in accordance with s. 922.105....
Section 2. Section 922.105, Florida Statutes, is amended to read:
922.105 Execution of death sentence; prohibition against reduction of death sentence as a result of determination that a method of execution is unconstitutional.
(1) A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution. The sentence shall be executed under the directions of the Secretary of Corrections or the secretary's designee.
(2) A person convicted and sentenced to death for a capital crime at any time shall have one opportunity to elect that his or her death sentence be executed by electrocution. The election for death by electrocution is waived unless it is personally made by the person in writing and delivered to the warden of the correctional facility within 30 days after the issuance of mandate pursuant to a decision by the Florida Supreme Court affirming the sentence of death or, if mandate issued before the effective date of this act, the election must be made and delivered to the warden within 30 days after the effective date of this act. If a warrant of execution is pending on the effective date of this act, or if a warrant is issued within 30 days after the effective date of this act, the person sentenced to death who is the subject of the warrant shall have waived election of electrocution as the method of execution unless a written election signed by the person is submitted to the warden of the correctional facility no later than 48 hours after a new date for execution of the death sentence is set by the Governor under s. 922.06.
Fla. S.B. 10-A, § 1-2 (2000). Governor Bush signed the bill on January 14, 2000.
[12] The trial court rejected this claim, ruling that:

Sims's argument that Florida cannot change its method of execution and retroactively apply the new method without violating the constitutional prohibition against ex post facto legislation, must fail. Lethal injection may be substituted as an alternative means of execution because Sims was on notice of the severity of the punishment attributable to his crime at the time of the offense. The change in the means of execution does not criminalize or punish conduct which was innocent when committed, enhance a prior punishment for the same crime, or abrogate a previously valid defense to a crime.
In so concluding, the trial court relied on Collins v. Youngblood, 497 U.S. 37, 52, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (holding that statute enacted after defendant's crime and allowing reformation of improper verdicts did not violate ex post facto clause if applied retroactively to defendant's case), and Dobbert v. Florida, 432 U.S. 282, 292, 297-98, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (holding that changes in Florida's death penalty scheme were not ex post facto law because the changes were purely procedural and ameliorative to the defendant).
[13] In that case, the South Carolina legislature changed the method of execution from hanging to electrocution.
[14] Several states have followed the reasoning and logic in Malloy in applying the new method of execution to prisoners whose crimes where committed prior to the change in the law. See, e.g., Hernandez v. State, 43 Ariz. 424, 32 P.2d 18 (1934) (constitutional amendment switching from hanging to lethal gas); State ex rel. Pierre v. Jones, 200 La. 808, 9 So.2d 42 (1942) (statutory enactment switching from hanging to electrocution); State v. Brown, 342 Mo. 53, 112 S.W.2d 568 (1937) (statutory amendment switching from hanging to lethal gas); Woo Dak San v. State, 36 N.M. 53, 7 P.2d 940 (1931) (switching from hanging to electrocution); Ex parte Granviel, 561 S.W.2d 503 (Tex.Crim.App.1978) (switching from electrocution to lethal injection). The reasoning appears to be similar in cases where the legislature amends the law to give defendants the opportunity to elect the method of execution. Indeed, several courts have held that a change in the method of execution which gives the inmate the option of choosing the method of execution is not an ex post facto law. See Poland v. Stewart, 117 F.3d 1094, 1105 (9th Cir.1997) (interpreting Arizona law; holding that mere existence of an option does not violate defendant's constitutional rights and change in the method of execution does not make the punishment more burdensome); Vickers v. Stewart, 144 F.3d 613, 617 (9th Cir.1998); DeShields v. State, 534 A.2d 630, 639 n. 7 (Del.1987); Wetzel v. Wiggins, 226 Miss. 671, 85 So.2d 469, 471 (1956) (holding that because inmate could be executed by electrocution if he did not select lethal gas, his punishment was consistent with the law in effect prior to the passage of the new law and therefore the new law was not ex post facto); State v. Fitzpatrick, 211 Mont. 341, 684 P.2d 1112, 1113 (1984).
[15] In Dowling, this Court held that a change in the method of execution could not be retroactively applied to a prisoner who had been convicted and sentenced prior to the enactment of the new law. Thus, the prisoner had to be executed under the law in effect at the time the crime was committed, which was by hanging. See id. at 612-15, 109 So. at 592-93.
[16] The written protocol provides general procedures for the prisoner's last meal, the persons authorized in the execution area, the placement of media witnesses, the physical examination of the prisoner prior to the execution, the preparation of the execution chamber, the persons authorized in the execution chamber, the witnesses to the execution, the prisoner's last statement and the administering of the lethal injection.
[17] The witnesses included: James Crosby, Warden of the Florida State Prison; William Mathews, a physician's assistant with the DOC; and Michael Moore, Secretary of the DOC. Collectively, they provided the execution-day procedures. On the morning of the execution, the inmate will receive a physical examination, be given a Valium if necessary to calm anxiety, and will receive his or her last meal. Next, the inmate will be taken to the execution room where he will be strapped to a gurney and placed on a heart monitor. The inmate will then be injected with two IV's containing saline solution. He will then be escorted into the execution chamber where the witnesses will be able to view the execution. While the inmate is being prepared, a pharmacist will prepare the lethal substances. In all, a total of eight syringes will be used, each of which will be injected in a consecutive order into the IV tube attached to the inmate. The first two syringes will contain "no less than" two grams of sodium pentothal, an ultra-short-acting barbiturate which renders the inmate unconscious. The third syringe will contain a saline solution to act as a flushing agent. The fourth and fifth syringes will contain no less than fifty milligrams of pancuronium bromide, which paralyzes the muscles. The sixth syringe will contain saline, again as a flushing agent. Finally, the seventh and eighth syringes will contain no less than one-hundred-fifty milliequivalents of potassium chloride, which stops the heart from beating. Each syringe will be numbered to ensure that they are injected into the IV tube in the proper order. A physician will stand behind the executioner while the chemicals are being injected. The physician's assistance will also observe the execution and will certify the inmate's death upon completion of the execution. Moore testified that these procedures were created with the purpose of "accomplish[ing] our mission with humane dignity [while] carrying out the court's sentence."

On the issue of dosage, a defense expert admitted that only one milligram per kilogram of body weight is necessary to induce unconsciousness, and that a barbiturate coma is induced at five milligrams per kilogram of body weight. Thus, two grams of sodium pentothal (i.e., 2000 milligrams) is a lethal dose and certain to cause rapid loss of consciousness (i.e., within 30 seconds of injection). The expert further stated that muscle paralysis occurs at .1 milligram of pancuronium bromide per kilogram of body weight. Thus, fifty milligrams of pancuronium bromide far exceeds the amount necessary to achieve complete muscle paralysis. Finally, the expert admitted that 150 to 250 milliequivalents of potassium chloride would cause the heart to stop if injected quickly into the inmate and that an IV push would qualify as "quickly."
[18] This claim includes several subissues: (1) lethal injection can be cruel and unusual punishment based on the number of reported problems in correctly administering such executions around the country; (2) the lack of written guidelines for carrying out lethal injection constitutes cruel and unusual punishment because the participants may not know what to do if a problem occurs; (3) the participants to the execution do not know what their function is; (4) under the protocols, the DOC intends to give the inmate his last meal an hour before the execution which contradicts standard anesthesia protocols on the consumption of food and fluids prior to administering sodium pentothal; (5) the testimony at the hearing conflicts with the written protocol on the procedure to be followed if the inmate does not die after the initial series of injections; (6) the written protocols conflict with state law concerning the witnesses to the execution; (7) the lack of specific protocols subjects Sims to a risk of pain, torture and degradation in violation of Eighth Amendment; (8) the act violates the separation of powers clause because (a) it unlawfully delegates to the DOC the power to determine and administer the lethal substances without explanation, standards or guidelines and (b) it gives the DOC the power to determine whether the method of execution has been elected or defaulted. Subissues (1) through (7) relate to the lack of specific written details about the execution procedures, the chemicals to be administered and the roles of the persons who will be carrying out the execution. Because these subissues concern the adequacy and sufficiency of the DOC's written protocol, we have treated these seven subissues together. Sims' eighth subissue will be treated separately.
[19] Professor Radelet testified that lethal injection is the most commonly "botched" method of execution in the United States, with Virginia and Texas being the two states with the highest number of mishaps. He claims that 5.2 percent of the lethal injections encountered unanticipated problems. He also provided examples of what could go wrong during the lethal injection, citing to specific examples throughout the country. The professor admitted, however, that the documented occurrences in his study came from newspaper accounts of the execution and did not come from first-hand, eyewitness accounts or formal findings following a hearing or investigation into the matter.

Dr. Lipman, a neuropharmacologist, provided examples of what could happen if the drugs are not administered properly or if the personnel are not adequately trained to administer the lethal substances. For example, if too low a dose of sodium pentothal is administered, the inmate could feel pain because low dosages of such drug have the opposite effectit makes the pain more acute. In addition, if the drugs are not injected in the proper order, the inmate could suffer pain because he would not be properly anesthetized. Dr. Lipman further noted that if the drugs are not administered in a timely manner, the sodium pentothal could wear off, causing the inmate to regain consciousness. However, Dr. Lipman admitted that lethal injection is a simple procedure and that if the lethal substances to be used by DOC are administered in the proper dosages and in the proper sequence at the appropriate time, they will "bring about the desired effect." He also admitted that at high dosages of the lethal substances intended be used by the DOC, death would certainly result quickly and without sensation.
[20] We note that of the states that impose the death penalty, most use lethal injection either as the sole means of execution or as a possible option at the election of the inmate. Further, several courts have considered constitutional challenges to lethal injection and have held that such method comports with the prevailing constitutional and societal norms. See LaGrand v. Lewis, 883 F.Supp. 469, 471 (D.Ariz.1995) (citing cases that have affirmed constitutionality of lethal injection); State v. Deputy, 644 A.2d 411, 421 (Del.Super.Ct.1994).
[21] Article II, section 3, of the Florida Constitution states:

The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.
[22] See also Colo.Rev.Stat. Ann. § 16-11-401 (West 1998) ("`[L]ethal injection' means a continuous intravenous injection of a lethal quantity of sodium thiopental or other equally or more effective substance sufficient to cause death."); Idaho Code § 19-2716 (1997) (same as Arkansas statute); 725 Ill. Comp. Stat. Ann. 5/119-5 (West 1997) ("death shall be executed by an intravenous administration of a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent and potassium chloride or other equally effective substances sufficient to cause death"). Only two other states have statutes worded similarly to Florida's: Missouri and South Carolina. In both of these states, the statute simply states the means of execution without providing a definition of the procedure or the drug to be used. See Mo.Rev. Stat. § 546.720 (Supp.2000) (lethal gas or lethal injection); S.C.Code Ann. § 24-3-530 (Law Co-op. Supp.1999) (lethal injection or electrocution).
[23] Sims' remaining argument, that the DOC has unfettered discretion to determine whether the method of execution has been elected or defaulted, is without merit.
[24] In his habeas petition, Sims argues that this Court's decision in Stephens v. State, 748 So.2d 1028 (Fla.1999), requiring de novo review of ineffective assistance of counsel claims whereby deference is given only to the trial court's findings of fact, constitutes a change in the law. On the basis of Stephens, Sims contends that this Court applied an incorrect standard in reviewing his ineffective assistance claim in its 1992 opinion. See Sims v. State, 602 So.2d 1253 (Fla.1992). Accordingly, he asks this Court to reconsider his ineffective assistance of counsel claims in light of the standard of review announced in Stephens.