PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 96-3329
_____

D. C. Docket No. 94-30327

ANTHONY BRADEN BRYAN,

Petitioner-Appellant,

versus

HARRY K. SINGLETARY, JR., Secretary
Florida Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(May 11, 1998)

Before ANDERSON, COX and CARNES, Circuit Judges.

PER CURIAM:

Anthony Braden Bryan appeals the district court's denial of his petition for writ of habeas corpus. Bryan asserts that he was denied the effective assistance of counsel at his capital penalty phase because he failed to call any mental health experts to testify.[1]

## FACTS AND PROCEDURAL HISTORY

On May 27, 1983, Bryan robbed a bank in Grand Bay, Alabama with a sawed-off shotgun. He was not caught after the crime and spent the next three months as a fugitive from the law. In June 1983, Bryan met Sharon Cooper ("Cooper") in Jacksonville, Florida and the two hitchhiked to Mississippi. After obtaining a truck in Mississippi, the two drove back to Florida, stopping en route to retrieve the sawed-off shotgun that Bryan had used in the bank robbery.

---

[1] We summarily reject Bryan's other claims. Bryan's argument--that his death sentence is unreliable because neither the sentencing judge nor the Florida Supreme Court addressed the aggravating and mitigating circumstances in a manner that reflected a "reasoned judgment"--is wholly without merit and warrants no discussion. We also conclude that the following claims asserted by Bryan are procedurally barred and that Bryan has not established cause and prejudice: (1) his claim based upon Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed 231 (1985); and (2) his claim that the aggravating factors in Florida's capital sentencing statute are facially vague and overbroad, and that the jury was not given a narrowing instruction to cure the vagueness.

The issue of the applicability of the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915, to habeas corpus proceedings was raised by motion and carried with this case. That issue has now been resolved. In Anderson v. Singletary, 111 F.3d 801 (11th Cir. 1997), we held that habeas corpus actions, such as this case, are not subject to the provisions of the PLRA. Accordingly, appellant's motion seeking relief from PLRA is granted.

In Florida, Bryan obtained a cabin cruiser in order to travel back to Mississippi. The boat became damaged and Bryan and Cooper stopped in Pascagoula, Mississippi to make repairs. Bryan borrowed tools from George Wilson ("Wilson"), the victim, and unsuccessfully tried to repair the boat. Needing transportation and money, Bryan robbed Wilson at gunpoint and tied him up for the night. Bryan then took Wilson's keys and robbed the seafood wholesaler where Wilson worked as a night watchman.

After returning from the seafood wholesaler, Bryan placed Wilson in the back of Wilson's car. Bryan and Cooper then drove Wilson to Santa Rosa County where the three stayed in a motel. Leaving the motel, Bryan drove Wilson to a secluded spot in the woods. He marched Wilson, with his hands tied, at gunpoint to a spot beside a creek. Fearing for his life, Wilson pleaded that he not be crippled. Bryan knocked Wilson over the head with the shotgun. As Wilson fell into the creek, Bryan shot him in the face with the sawed-off shotgun. Bryan then pushed Wilson's car into a nearby river.

In August 1983, Bryan and Cooper were arrested in Madison County, Florida for driving a stolen car. Following her release, Cooper went to offices of the FBI to report that Bryan had robbed, kidnapped, and murdered George Wilson. After being arrested by authorities, Bryan escaped from the Santa Rosa County jail in July 1984. He was re-arrested in Colorado in October 1985. At trial for the murder of George Wilson, Cooper was the state's chief witness. A jury convicted Bryan of first-degree murder, robbery with a firearm, kidnapping with a firearm, and felony murder.

3

At the sentencing, Bryan called seven witnesses to testify on his behalf; including his mother, grandmother, ex-wife, a co-worker, and people who knew Bryan when he was a fugitive between July 1984 and October 1985. Bryan also introduced written reports prepared by four separate mental health experts as well as the deposition of a psychiatrist. The jury returned an advisory sentence of death. On May 16, 1986, Judge Wells accepted the jury's recommendation, finding numerous aggravating factors and two mitigating factors, and sentenced Bryan to death in Florida's electric chair.

The Florida Supreme Court denied Bryan's direct appeal, and the United States Supreme Court denied Bryan's petition for certiorari. Bryan v. State, 533 So.2d 744 (Fla. 1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1765, 104 L.Ed.2d 200 (1989). Bryan then filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 in state circuit court and a petition for writ of habeas corpus in the Florida Supreme Court. After conducting an evidentiary hearing on Bryan's penalty-phase ineffective assistance of counsel claim on August 29, 1991, the circuit court denied all relief. The Florida Supreme Court affirmed the denial of post-conviction relief and denied state habeas corpus relief. Bryan v. Dugger, 641 So.2d 61 (Fla. 1994). Finally, Bryan filed a petition in federal court on October, 19, 1994, pursuant to 28 U.S.C. § 2254.[2] The district court denied this petition on July 19, 1996. The district court then granted Bryan's October 10, 1996, application for certificate of probable cause.

---

[2]    Both parties concede that, under the law of this circuit, the Antiterrorism and Effective Death Penalty Act of 1996 does not apply to this case.

4

DISCUSSION

Bryan asserts that he was denied the effective assistance of counsel because his attorney did not call any mental health experts to testify at the penalty phase of the state proceedings. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984). Although Bryan's attorney intended to offer a defense based upon Bryan's mental state,[3] and he stated at the outset of the penalty phase that he intended to present the testimony of mental health experts, he did not call Dr. Barbara Medzerian, Dr. Ellen Gentner, or Dr. James D. Larson to testify during the penalty phase.[4] Instead, Bryan's attorney submitted only the medical reports of four experts, primarily addressing competency and sanity and not mitigation.

The three mental health experts appeared willing to testify at the trial, but were not called by Bryan's attorney for different reasons. Dr. Medzerian appeared at the courthouse on the day of the penalty phase and waited outside the courtroom, but was not called to

[3] In his testimony at the 1991 postconviction proceeding, Bryan's attorney testified that he was pursuing a defense in the penalty phase based upon Bryan's mental state.

[4] These three mental health experts had evaluated Bryan prior to the trial. Dr. Larson was appointed by the court to do an evaluation as a confidential expert. Dr. Medzerian conducted a psychological evaluation on Bryan in order to determine Bryan's competency to stand trial. Following Dr. Medzerian's evaluation, Dr. Gentner was requested to determine the extent of a possible organic brain syndrome.

5

testify because Bryan's attorney did not realize she was there.[5] Dr. Gentner claimed that she did not testify because she was not contacted by Bryan's attorney. As a result, she was out of town the day of the penalty proceeding.[6] Finally, Dr. Larson appeared at the courthouse on the morning of the penalty phase, but Bryan's attorney decided not to call him to testify because Dr. Larson warned Bryan's attorney that his testimony may not be beneficial to Bryan's case.

Bryan also asserts that he did not receive effective assistance of counsel because his attorney failed to effectively prepare the testimony of these mental health experts. Bryan's attorney did not obtain records related to Bryan's history although experts had requested this information. He did not meet with the experts before their testimony in order to familiarize them with the concept of mitigating circumstances.

Bryan claims that the deficient performance of his counsel prejudiced him at the penalty phase because the jury was not able to hear evidence regarding both statutory and nonstatutory mitigating factors.[7] Bryan asserts that the failure of his trial attorney to bring

---

[5] Dr. Medzerian testified at the postconviction hearing that she was subpoenaed to appear at the penalty phase. No subpoena is present in the record.

[6] Dr. Gentner testified at the postconviction proceeding that, had she been asked by Bryan's attorney, she would have testified.

[7] In the court's sentencing order, the trial judge found the existence of only two nonstatutory mitigating factors: Bryan's law-abiding life after his escape from the Santa Rosa County jail and his good work record prior to his fall from the mast of a shrimp boat. The court's sentencing order states, "Although the Court has heard testimony about an accident several years prior to this murder and that the defendant's aberrant behavior started about that time, there has been no medical testimony to support the claim."

6

this medical testimony to the penalty phase demonstrated deficient performance and was prejudicial to his case because Bryan was not able to piece together for the jury his history and the evidence relating to his mental health problems. With this testimony, Bryan claims that the jury would have been able to understand the entire picture of his decline–how a loving family man and hardworking shrimp boat captain could murder another man in such a cruel and terrible manner. Although the jury was given mental health reports from these experts, the reports did not address the statutory and nonstatutory mitigating factors at the penalty phase and spoke in language inaccessible to the lay person. According to Bryan, the testimony of these three mental health experts, Doctors Medzerian, Larson, and Gentner, provided the lynch pin that would have given the jury the insight necessary to understand Bryan's fragile and tenuous mental condition.

A claim that a defendant's counsel was so defective as to require habeas corpus relief from a conviction or death sentence has two components. First, the defendant must demonstrate that the counsel's performance was deficient. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. Second, the defendant must show that the counsel's deficient performance prejudiced the defendant. Id. Both showings are required in order for the defendant to make out a claim for ineffective assistance of counsel under the Sixth Amendment. Because Bryan cannot satisfy the prejudice prong, we need not address the performance prong.

In Strickland, the Supreme Court established the test for prejudice. The Court wrote:

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

7

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, 466 U.S. at 694, 104 S.Ct. at 2068; see also id. 466 U.S. at 695, 104 S.Ct. at 2069 ("[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.").

Bryan asserts that he was prejudiced by the fact that his attorney did not call Dr. Gentner, a witness that his attorney had subpoenaed, to testify during the penalty phase.[8] Bryan argues that the testimony of Dr. Gentner would have established mitigating factors, namely, that Bryan was suffering from extreme emotional disturbance (Fla. Stat. § 921.141(6)(b)), and that Bryan's capacity to conform his conduct to the requirements of the law was substantially impaired (Fla. Stat. § 921.141(6)(f)). However, the evidence does not support Bryan's argument that Dr. Gentner would have been helpful in establishing the

---

[8] Bryan also claims that he was prejudiced when his attorney failed to provide the *live* testimony of Dr. James Larson. Dr. Larson told Bryan's attorney, minutes before he was supposed to testify, that he did not believe his testimony would be helpful to Bryan. In his 1991 testimony at the postconviction proceeding, Bryan's attorney stated that he decided not to call Larson because "[he] indicated that he would hurt us if he testified." Based upon this belief, counsel even decided not to submit Larson's report to the jury. Larson's report indicates doubt about Bryan's claims of hallucinations. The report also states that no information existed to indicate that Bryan suffered from an impaired ability to appreciate the criminality of his actions. Even if other reasonable lawyers would have made a different decision, no relief can be granted unless it is shown that no reasonable lawyer in these circumstances would have done so. Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). We conclude that Bryan's attorney made a reasonable tactical decision not to call Dr. Larson to testify during the penalty phase of the proceedings.

8

existence of these mitigating factors. Dr. Gentner testified in the post-conviction hearing that she was "uncomfortable . . . saying extreme mental disturbance." Although Dr. Gentner testified that "there would be impairment in [Bryan's] ability to conform that conduct to the requirements of the law," she could not conclusively say from her testing that this impairment would be *substantial*. When asked what Bryan's mental state might have been at the time of the murder, Dr. Gentner remarked that she didn't "feel comfortable addressing that."

Bryan also asserts that he received ineffective assistance of counsel because his attorney failed to have Dr. Medzerian testify before the jury during the penalty phase. He contends that Dr. Medzerian could have identified the existence of both statutory and nonstatutory mitigation, such as emotional disturbance, an abusive childhood, a solid work history, and a loving relationship with his children and wife. With respect to statutory mitigation, however, Dr. Medzerian testified in 1991 that she could only testify as to one statutory factor–extreme emotional or mental disturbance. Dr. Medzerian could not offer testimony as to any other statutory mitigating factor involving emotional distress.

As to the nonstatutory mitigation, we conclude that other witnesses testifying for Bryan in the penalty phase amply supplied this information to the jury. Bryan's attorney called seven witnesses to testify on behalf of Bryan, including: his mother, ex-wife, grandmother, aunt, former employer, and witnesses who were familiar with Bryan during the period in which he was a fugitive from the Santa Rosa County jail. These witnesses testified about all aspects of Bryan's past and his family history. His mother testified that she had

9

been involved in a severe car accident while she was pregnant with Bryan. She also testified that Bryan became unconscious when he drank, on a dare, an entire bottle of vodka when he was a young child.[9] Bryan's aunt testified that she had been diagnosed as a paranoid schizophrenic and that there was some evidence of a family history of mental disturbance.[10] His ex-wife testified that Bryan had been a loving father and husband. She also testified that his behavior had become erratic after a thirty-foot fall on a fishing boat in 1981. His former boss testified that he had been a good worker. After reviewing the transcript of the sentencing phase, we conclude that the jury was made sufficiently aware of the nonstatutory mitigation that Dr. Medzerian testified to in her 1991 postconviction testimony.

It could even be argued that the closing arguments made by Bryan's attorney during the penalty phase were more helpful to Bryan than the live testimony of these mental experts would have been. Indeed, Bryan's attorney argued to the jury in 1986 that the doctors' reports conclusively established the existence of both statutory factors involving mental health problems, (6)(b) and (6)(f). By contrast, the doctors' testimony in 1991 at the postconviction hearing does not establish that both of these mitigating factors were present.

---

[9] Bryan's mother also testified that Bryan was rejected by his natural father and that he felt alienated by his stepfather.

[10] Bryan's aunt testified that she had been hospitalized for paranoid schizophrenia for a period of three months. Her medical records were submitted to the jury. Bryan's aunt testified that her son and daughter had also been diagnosed with schizophrenia and hospitalized. Medical reports documenting her son's mental disturbance were submitted to the jury. Bryan's aunt also testified that her sister, another aunt of Bryan's, was hospitalized with psychological problems.

Dr. Gentner could not say with any assurance that either statutory mitigating factor existed, and Dr. Medzerian could testify to the existence of only one.

Because of Bryan's early insistence that he did not remember the events surrounding the murder, Dr. Gentner's live testimony may have affirmatively hurt Bryan's chances at the penalty phase. Following his arrest, Bryan told the mental examiners that he could not remember anything about the murder or the surrounding circumstances. The examiners used this as part of their medical diagnosis, concluding that Bryan suffered from an "organic brain syndrome." However, Bryan gave detailed testimony at trial about the events that occurred on the day of the murder and surrounding circumstances. In closing arguments to the jury during sentencing, the prosecutor argued that Bryan had lied when he told the battery of doctors that he could not remember details of the murder. He argued that any mental deficiency that the doctors found was based on Bryan's lies. In her post-conviction testimony, Dr. Gentner added fuel to this argument by testifying that Bryan's testimony at trial was the "complete opposite" of the statements Bryan had made to her and Dr. Medzerian about the murder.

The live testimony of Dr. Medzerian would have exposed the doctor to cross-examination regarding the characterization in her report that Bryan had "fake[d] bad."[11]

---

[11]    On two separate occasions, Dr. Medzerian conducted a total of three Minnesota Multiphasic Personality Inventory ("MMPI") tests on Bryan. The first two tests were administered during a competency evaluation conducted in order to determine Bryan's sanity at the time of the offense. Following the first MMPI, Dr. Medzerian reported that the test registered an "invalid profile." The next day, after receiving Bryan's assurance that he was able to read and understand the questions, Dr.

11

After one of the tests taken by Bryan, Dr. Medzerian believed that Bryan had attempted to manipulate the test by making himself appear to be more "pathological" than he would otherwise appear to be. During sentencing, the state emphasized that Bryan had been less than honest with his assertion that he could not remember the events of the murder. The ability to cross-examine the doctors and thus emphasize Bryan's attempt to manipulate the doctors could have bolstered the state's position.

The testimony of Doctors Medzerian and Gentner may also have hurt Bryan because their psychological profiles of Bryan did not match the circumstances of the crime. Dr. Gentner's suggestion that Bryan's mental health problems would tend to make him impulsive, or lacking the capacity to foresee the consequences of his conduct, does not fit with the facts of this case. In her testimony at the post-conviction hearing, Dr. Gentner testified that Bryan had organic brain damage with a low IQ. She also testified that "organic personality syndrome" manifests itself in "impulsive" behavior with a diminished "planning ability."

---

Medzerian administered a second MMPI test. In her first report, Dr. Medzerian wrote that this second test resulted in a similar "invalid profile." She stated in her report that "[t]he particular pattern of invalidity that was obtained is highly indicative of an attempt to 'fake bad', that is, to exaggerate one's symptoms and consequently appear more pathological than is really the case." After this first evaluation of Bryan, and before he was actually brought to trial for this offense, Bryan escaped from a county jail and remained a fugitive for over a year. Dr. Medzerian evaluated Bryan's competency to stand trial again following his recapture. At this evaluation, Bryan registered a valid MMPI test. In this report, Dr. Medzerian indicated that Bryan's "significant memory losses . . . could suggest an organic brain syndrome." Dr. Medzerian also stated that any psychological problems possessed by Bryan would likely not "impair . . . his ability to distinguish right from wrong."

This testimony does not, however, accurately describe the events surrounding the murder of George Wilson. The facts of this case suggest that the murder was anything but "impulsive." While on the run from police for a bank robbery, Bryan used a cabin cruiser to travel from Florida to Mississippi. The boat's motor became damaged near Pascagoula, Mississippi and Bryan stopped to make repairs. When he was unsuccessful in making these repairs, he robbed Wilson of his keys and tied him up. Bryan then robbed Wilson's place of employment. Returning to Wilson's trailer, Bryan put Wilson in the victim's own car and drove him to another county for an evening in a motel. That next morning, Bryan drove Wilson around the countryside looking for a secluded spot. Bryan parked the car, marched the bound man into the woods, and shot him at close range. Looking at the facts of this case, it does not appear Bryan acted in an impulsive manner.

The facts of this case also do not indicate that Bryan suffered from a diminished capacity to plan his activities. The murder of George Wilson was an orchestrated attempt to continue Bryan's flight from the law because Bryan needed to further cover his tracks. As opposed to his victims at the bank robbery (where Bryan wore a mask), George Wilson would have been able to directly identify Bryan to the police. Further, the murder of Wilson was not an instantaneous decision but a plot developed over the course of an entire evening that involved transporting the victim a considerable distance and staying overnight in a motel.

Evidence also suggests that Bryan planned his activities following the crime, attempting to create an alibi for himself and Sharon Cooper. Following the murder, he drove

13

around looking for a place to hide the car, and he finally dumped it in a river. He mailed the murder weapon, a sawed-off shotgun, and some clothing to Biloxi, Mississippi. Later, Bryan attempted to have a fellow inmate at the Springfield Medical Center assist him in concocting an alibi for the crime. These are not the actions of an impulsive person, a person unable to plan, or a person suffering from a substantially impaired ability to "appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Instead, they are the actions of a person calculating the disposal of incriminating evidence and reconstructing the events of a murder.

Even if Bryan's attorney were able to present the live testimony of these experts, we conclude that there is no reasonable probability that the fact finder would have reached a different conclusion. See Strickland, 466 U.S. at 694-95; 104 S.Ct. at 2068-69; see also Mills v. Singletary, 63 F.3d 999, 1025-26 (11th Cir. 1995). As we have previously recognized, the assistance of even the best lawyering in some situations may not be enough to convince a jury to overlook the details of a horrible murder, or a less brutal murder with substantial evidence of guilt. Clisby v. State of Alabama, 26 F.3d 1054, 1057 (11th Cir. 1994). In the face of strong aggravating circumstances, the failure to present psychiatric testimony may not be prejudicial to the defendant, especially so in this case where the substance of Bryan's health problems was in fact before the jury, and where the conclusions of experts which Bryan now proffers are inconsistent with Bryan's actions in implementing a complicated murder scheme and his elaborate attempts to cover his tracks.

In the instant case, the Florida Supreme Court found six aggravating circumstances: Bryan had a prior conviction for a crime of violence, Fla. Stat. § 921.141(5)(b); the capital felony was committed while Bryan was engaged in the commission of another felony, Fla. Stat. § 921.141(5)(d) (robbery, kidnapping); the murder was committed in order to avoid arrest, Fla. Stat. § 921.141(5)(e); the capital felony was committed for pecuniary gain, Fla. Stat. § 921.141(5)(f); the capital murder was especially heinous, atrocious, or cruel, Fla. Stat. § 921.141(5)(h); and the capital felony was a homicide that was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification, Fla. Stat. § 921.141(5)(I).[12]

The details of this crime are also especially heinous. Bryan kidnapped an elderly man at gunpoint, tied him up, stuck him in the back of his own car, and drove him across county lines. After spending the night at a motel, Bryan took Wilson out to a remote, wooded area. Bryan parked the car and led Wilson, still tied-up, into the woods. Bryan took Wilson beside a stream. While Wilson begged for his life, the defendant knocked him over the head with the butt of a shotgun. Bryan then shot Wilson in the face as his body fell into the water.

In light of the aggravating and mitigating factors, and in light of the limited value of the proffered expert testimony, Bryan's argument does not undermine our confidence in the

---

[12] The judge found two mitigating circumstances. Specifically, the court found that the defendant had a good employment history as a shrimp boat captain, and that Bryan led a law-abiding and peaceful life while he lived in Arizona after his escape from the Santa Rosa County jail.

15

determination of the state trial court. Bryan did not show that he was prejudiced by the performance of his counsel; we cannot find that he received ineffective assistance of counsel.[13]

The denial of relief is AFFIRMED.

---

[13] Bryan makes a separate claim based on <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985). However, the substance of this claim is not different from Bryan's ineffective assistance claim concerning the sentencing phase. Therefore, this <u>Ake</u> claim is without merit for the reasons indicated in the text.