753 So.2d 1244 (2000)
Anthony Braden BRYAN, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-335.
Supreme Court of Florida.
February 22, 2000.
*1246 Gregory C. Smith, Capital Collateral Counsel, Northern Region, and Andrew Thomas, Chief Assistant CCC-NR, Office of the Capital Collateral CounselNorthern Region, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General, Richard B. Martell, Chief, Capital Appeals, and Barbara J. Yates, Assistant Attorney General, Tallahassee, Florida, for Appellee.
PER CURIAM.
Anthony Braden Bryan, a prisoner scheduled for execution on February 24, 2000, has filed an appeal and petition for extraordinary relief challenging the trial court's denial of relief, and requests a stay of execution. This Court has jurisdiction. See art. V, § 3(b)(1), Fla. Const.
Bryan's convictions and death sentence are described in Bryan v. State, 533 So.2d 744 (Fla.1988).[1] The numerous proceedings before the Florida and Federal courts, including litigation following his two death warrants, are explained in Bryan v. State, 748 So.2d 1003 (Fla.1999).
When Bryan was last before this Court, he filed, among other things, an all-writs petition claiming that death by electrocution was unconstitutional and relied on the dissenting opinions in Provenzano v. Moore, 744 So.2d 413 (Fla.1999). The State responded that the petition should be denied pursuant to the holding in Provenzano, wherein this Court upheld the constitutionality of electrocution. This *1247 Court denied Bryan's petition by order on October 20, 1999. See Bryan v. Moore, 744 So.2d 452 (Fla.1999)(unpublished order).
The United States Supreme Court granted Bryan's petition for writ of certiorari on the denial of the all-writs petition on October 26, 1999, but then dismissed certiorari as improvidently granted on January 24, 2000. See Bryan v. Moore, ___ U.S. ___, 120 S.Ct. 394, 145 L.Ed.2d 306 (1999), cert. dismissed, ___ U.S. ___, 120 S.Ct. 1003, 145 L.Ed.2d 927 (2000). On January 26, 2000, the Governor rescheduled Bryan's execution to Thursday, February 24, 2000.
Subsequent to the rescheduling of his execution, Bryan filed in the trial court motions to (1) open and release confidential records pertaining to his trial counsel's treatment for alcoholism; (2) declare unconstitutional public record exemptions contained in section 945.10(1)(e), Florida Statutes (1999), and chapters 2000-2 and 2000-1 of the Laws of Florida; (3) compel public records disclosure regarding lethal injection; (4) find the new lethal injection statute unconstitutional under the Savings Clause of the Florida Constitution; and (5) find that the Department of Corrections' (DOC) failure to disclose information about lethal injection left Bryan unable to make an informed decision as to which execution method he should choose. The trial court held a hearing on Saturday, February 12, 2000, and denied all relief in three written orders and denied rehearing on Friday, February 18, 2000. Bryan appeals the trial court's decision as to the above issues and raises additional claims.
The first issue is whether the trial court abused its discretion in denying Bryan's motion to open and release confidential records pertaining to his trial counsel's treatment for alcoholism. We hold that the trial court properly denied Bryan's motion to open Ted Stokes' treatment records. Section 397.501 of the Florida Statutes provides that alcohol treatment records are confidential, but authorizes the disclosure of the records by court order pursuant to a showing of good cause. See § 397.501(7)(a)5, Fla. Stat. (1999). The alleged good cause in this case is that additional evidence concerning trial counsel's substance abuse would show why trial counsel conducted the defense as he did, thus undermining the perception that his conduct was based on trial strategy. We disposed of a similar claim in Bryan v. State, 748 So.2d 1003, 1004, wherein this Court stated:
Stokes' equivocal recollection that he may have been under the influence outside of trial does not warrant relief. See Kelly v. United States, 820 F.2d 1173, 1176 (11th Cir.1987)("There being no specific evidence that Kermish's drug use or dependency impaired his actual conduct at trial, Kelly has not met his initial burden of showing that Kermish's representation fell below an objective standard of reasonableness. See Strickland [v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)[2]].").
*1248 Id. Furthermore, in Bryan v. State the Court noted that we affirmed the trial court's determination with respect to ineffective assistance of counsel. 748 So.2d at 1004; see Bryan v. Dugger, 641 So.2d 61, 63-65 (Fla.1994)(this Court affirmed that allegations of guilt-phase ineffectiveness were insufficient to establish a violation of Strickland, and affirmed the trial court's denial of relief as to alleged sentencing-phase ineffectiveness after it held an evidentiary hearing thereon).
This Court's opinion in Bryan v. Dugger reveals that Stokes' performance was thoroughly examined in the postconviction stage and that his performance was not deficient. To that end, the trial court examined whether Stokes erred in "failing to present the mental health defense through live testimony, rather than submitting [experts'] reports prepared for a considered but rejected insanity defense"; allegations that Stokes "did not properly prepare the Defendant's family members for their testimony relating to non-statutory mitigating circumstances and that he failed to obtain the testimony of other family members who might give such evidence"; and Bryan's claim that Stokes' deficient performance in this area was not the result of a strategic decision, but rather a failure to meet a reasonably competent standard of performance. Id. at 63. The trial court explained that at the penalty phase, Stokes called several family members and a former employer to provide evidence of nonstatutory mitigating circumstances. Stokes submitted into evidence
the mental health evaluations of the Defendant prepared by Dr. Barbara Medzerian (two separate evaluations), Dr. Ellen Gentner, Dr. Jose C. Montes, and Dr. Philip B. Phillips. Further admitted were a psychiatric examination from Arizona State Hospital dated 8/6/70, and records from Camelback Psychiatric Hospital 10/10/73, both relating to Jean Hanley, an aunt of the Defendant. Records from Phoenix Baptist Hospital and Medical Center on Keith Hanley, a relative, were also introduced.
Id. at 63. The trial court further explained that "[a]lthough live testimony from the other mental health experts might have been helpful to the jury and judge, Mr. Stokes did introduce their written reports. The defense has not been able to present evidence or an argument to support their position that live testimony would have been more persuasive to a jury than the written documents." Id. at 64. Finally, the trial court explained:
Although in hindsight Mr. Stokes might have presented his case differently to the sentencing jury, this Court does not find that his performance was below the "broad range of reasonably competent performance under prevailing professional standards." Maxwell [v. Wainwright, 490 So.2d 927, 932 (Fla. 1986)]. Furthermore, this Court finds that there is no reasonable probability of a different sentencing result had the proffered family background testimony and the live testimony of the mental health experts, both presented at the evidentiary hearing, been offered during the 1986 penalty phase. This conclusion is made also in light of the six aggravating circumstances supported by the record and the Florida Supreme Court on direct appeal.
Id. at 64. This Court found that Stokes did not provide a deficient performance, but rather that obtaining a seven-to-five jury split on the death sentence recommendation was an accomplishment given the evidence of the brutal murder. The Court explained that:
This is not a case which defense counsel failed to prepare. Counsel had Bryan examined by seven mental health experts. He did not call Dr. Larson as a witness after the doctor told him that his *1249 testimony would not be helpful and that it suggested the possibility of malingering. He had Dr. Gentner under subpoena, but she was out of the state during the trial. Apparently, Dr. Medzerian came to testify in her place but counsel was not aware of her presence.
To introduce the medical reports of certain experts instead of having these experts testify in person was clearly a tactical decision. Several of the doctors indicated that Bryan had no memory of the circumstances surrounding the murder. Bryan, during the guilt phase of the trial and in contravention of the doctors' testimonies, testified in detail about the circumstances surrounding the murder. There was a clear danger that if the doctors were put on the witness stand they would discredit his veracity. Furthermore, of the three doctors who testified at the post-conviction hearing, Dr. Gentner did not believe Bryan met the criteria for either of the statutory mitigators and the other two doctors felt that only one mitigator existed. Each of the medical reports clearly indicated the existence of mental abnormalities, so Stokes was able to persuasively argue both statutory mental mitigators from these reports. The fact that the language of the reports was not couched in the exact terms of statutory mental mitigators does not mean that they were not used effectively.
As for nonmedical evidence, Stokes introduced the testimony of Bryan's mother, grandmother, and aunt as well as his ex-wife, a former employer, and a friend. The evidence supports the trial judge's conclusion that because of alienation between them, not all of the family would present favorable testimony. As noted in Maxwell v. Wainwright:

The fact that a more thorough and detailed presentation could have been made does not establish counsel's performance as deficient. It is almost always possible to imagine a more thorough job being done than was actually done.
In spite of the existence of six statutory aggravating circumstances and a gruesome murder preceded by a kidnapping, defense counsel was able to persuade five jurors to recommend life imprisonment. Now, several years after the fact, Bryan argues that if his lawyer had employed different tactics there is the possibility that he would have received a life sentence. After a full evidentiary hearing, the trial judge denied relief and the record supports his ruling.
Id. at 64-65 (citations omitted).[3] In light of the thorough review of Stokes' representation and the failure of any court to find either a deficient performance or prejudice, Bryan's claim that Stokes' alcoholism contemporaneous to his trial does not undermine the consistent finding of effective assistance in a difficult case. Accordingly, because Stokes' representation of Bryan was not deficient, and given that Bryan has not suffered any prejudice pursuant *1250 to Stokes' representation, the issue of whether Stokes was an alcoholic at the time of trial is irrelevant under Strickland. To that end, since Stokes' alcoholism is irrelevant under Strickland, the trial court properly denied Bryan's request to open and release Stokes' alcoholism treatment records.[4] Thus, we affirm the trial court's denial of relief on this issue.[5]
Bryan's second issue is whether public records disclosure exemptions under section 945.10(1)(e), Florida Statutes (1999), and chapters 2000-2 and 2000-1 of the Laws of Florida are unconstitutional. The Court holds that the trial court properly decided that the statutory exemptions are constitutional. Article I, section 24 of the Florida Constitution provides that "[e]very person has the right to inspect or copy any public record made or received in connection with the official business of any public body ..., except with respect to records exempted pursuant to this section.... "Art. I, § 24(a), Fla. Const. To that end, the legislature "may provide by general law for the exemption of records from the requirements of subsection (a) ... provided that such law shall state with specificity the public necessity justifying the exemption and shall be no broader than necessary to accomplish the stated purpose of the law." Id. § 24(c).
Section 945.10 provides, in part: Confidential information.
(1) Except as otherwise provided by law or in this section, the following records and information of the Department of Corrections are confidential and exempt from the provisions of s. 119.07(1) and s. 24(a), Art. I of the State Constitution:
. . . .
(e) Information which if released would jeopardize a person's safety.
§ 945.10, Fla. Stat. (1999). The exemption satisfies the requirements established in article I, section 24 in that the legislature provided a specific public necessity for the exemption as follows:
The Legislature finds that it is a public necessity that the department records enumerated in section 945.10(1), Florida Statutes, remain confidential and exempt from public disclosure as envisioned by the existing statute and rules because to provide otherwise would in some cases conflict with other existing law or would reveal information that would jeopardize the safety of the guards, inmates, and others. Thus, the harm from disclosure would outweigh any public benefit derived therefrom.... It is mandatory that prisons function as effectively, efficiently, and as nonviolently as possible. To release the exempted information to the public or to provide inmates with the information described in section 945.10, Florida Statutes, would severely impede that function and would jeopardize the health and safety of those within and outside the prison system.
*1251 Ch. 94-83, § 2, at 303-04, Laws of Fla.; compare Halifax Hosp. Med. Ctr. v. News-Journal Corp., 724 So.2d 567, 569-70 (Fla.1999)(holding that an exemption as to "strategic plans" was unconstitutional under article I, section 24(c) where there was no "justification for the breadth of the exemption"). Therefore, section 945.10(1)(e) satisfies the constitutional requirements for an exemption to the public records disclosure law since it provides a meaningful exemption that is supported by a thoroughly articulated public policy.[6]
Next, section 922.10, Florida Statutes (1999), as amended by chapter 2000-2, section 1 of the Laws of Florida, provides that "[i]nformation which, if released, would identify the executioner is confidential and exempt from the provisions of s. 119.07(1) and s. 24(a), Art. I of the State Constitution." § 922.10 Fla. Stat. (1999). Bryan's claim that this exemption is not supported by a public necessity is likewise unavailing. Chapter 2000-1, section 3 of the Laws of Florida provides the legislative finding that "the disclosure of information identifying a person ... administering a lethal injection for purposes of death sentence execution would jeopardize the person's safety and welfare by exposing that person to potential harassment, intimidation, and harm." Ch.2000-1, § 3, Laws of Fla. Thus, the legislature provided the requisite public necessity for the exemption.
Bryan's claim that chapter 2000-1, section 1 of the Laws of Florida (amending section 922.106, Florida Statutes (1999)), is unconstitutional is also without merit. The statute exempts from public disclosure the identity of persons involved in the "prescribing, preparing, compounding, [and] dispensing" of lethal injections. Ch.2000-1, § 1, Laws of Fla. As provided above, however, chapter 2000-1 provides that the identity of these persons should remain anonymous to ensure their safety, thereby satisfying the specific public necessity requirement for the exemption. See ch.2000-1, § 3, Laws of Fla. Because the three statutory exemptions satisfy the requirements mandated in article I, section 24(c) of the Florida Constitution, the trial court properly denied Bryan's claim for relief.
We also deny relief as to Bryan's third issue wherein he claims that the State violated public records disclosure requirements by improperly withholding records pertaining to lethal injection under chapter 119, Florida Statutes (1999). In response to Bryan's request for "any and all" records concerning lethal injection, the State disclosed the chemicals and procedures that will be used to carry out Bryan's execution by, among other things, submitting evidence developed in State v. Sims, No. E78-363-CFA (Fla. 18th Cir.Ct. Feb. 12, 2000), into the record in the instant case. Based on the evidence developed in that case, the trial court in Sims described lethal injection thusly:
Mr. [James V.] Crosby is the Warden at Florida State Prison where the execution is to take place. Mr. Crosby had considerable knowledge about the procedures to be used and provided the following information:
The requirements to be an executioner using lethal injection are simply that he or she must be over the age of twenty-one, a citizen of the State of Florida, and able to inject fluids using a syringe.

*1252 The person who will be the executioner in this case has observed two lethal injections in Virginia.
The procedure for execution by lethal injection is as follows:
The defendant is given a thorough physical examination sometime prior to the date of the execution, including a medical history.
On the date of the execution the defendant is fed his last meal. Utensils authorized are a plate and a spoon.
A physician consults with the defendant and explains the execution procedure. The defendant is offered Valium.
The defendant is escorted to the preparation area near the death chamber and is laid down on a gurney. The gurney has straps which are used to secure the defendant.
Two [IVs] are started by qualified medical personnel. One IV is placed in each arm. A saline solution is started in each IV.
Meanwhile, a pharmacist prepares eight syringes, numbered one through eight.
Syringes numbered one and two contain Sodium Pentathol. The dosage itself is lethal. This drug is used in surgical settings as an anaesthetic. It will take effect in a matter of seconds.
Syringe number three contains a saline solution which is used as a flushing agent.
Syringes four and five contain a lethal dosage of Pancuronium Bromide which causes paralysis.
Syringe six contains a saline solution which is used as a flushing agent.
Syringes seven and eight contain a lethal dosage of Potassium Chloride which will stop the heart from beating.
The syringes are inserted, in numerical order, into a port in the IV tube and are administered one after the other in the order stated.
Six persons are present in the death chamber besides the defendant. In addition to the executioner, there is a medical doctor, a physician's assistant, and three others, presumably security personnel. The medical doctor is present in the event there is some unusual event that needs medical attention and the physician's assistant is present both as an observer and to check for a pulse after the drugs have been administered.
Mr. Crosby testified that the procedure is designed to be dignified.
Several "walk throughs" have been performed by the execution team and the court is satisfied that the procedure is well rehearsed and the team is competent to perform its function. While defense counsel has made much of the fact that there are no written protocols to direct the team in the event there is a mishap, the medical doctor is there to give direction if that occurs and that is satisfactory.
Id. slip op. at 13-15 (footnotes omitted). This Court recently affirmed the trial court's order in Sims that established the sufficiency of the DOC's lethal injection protocol and procedures. See Sims v. State, 754 So.2d 657, 667-68 (Fla.2000). Thus, the State provided a thorough account of how Bryan's execution by lethal injection will be administered by the State of Florida, thereby evidencing the State's compliance with public disclosure requirements as to lethal injection as applicable to Bryan.
The State claimed exemptions regarding protocols from other states, written notes describing these protocols, DOC records regarding the development of lethal injection, the names of people on the execution team, and the travel records of persons sent to observe lethal injections in other states. Bryan claims that the trial court erred in allowing the State to exempt the above information from chapter 119 disclosure requirements. Bryan's claim fails, however, to show that any undisclosed information would provide a basis for relief. *1253 See Buenoano v. State, 708 So.2d 941, 947 (Fla.)("[Public records requests] shall not serve as a basis for a stay of execution unless Buenoano makes a showing that the documents sought contain newly discovered evidence likely to entitle her to relief."), cert. denied, 523 U.S. 1043, 118 S.Ct. 1358, 140 L.Ed.2d 507 (1998). Given the detailed disclosure of the chemicals and procedures that will be used during Bryan's scheduled execution, the above exempted material could not provide a basis upon which relief would likely be granted. Thus, the trial court properly denied relief.
On issue four, the trial court denied Bryan relief regarding his claim that chapter 2000-2 of the Laws of Florida, which provides for the choice of death by lethal injection or electrocution, may not be retroactively applied. On rehearing, the trial court correctly answered this question based on this Court's recent holding that chapter 2000-2 does not violate the Savings Clause of the Florida Constitution. See Sims, 754 So.2d at 668; art. X, § 9, Fla. Const. Chapter 2000-2 provides prisoners with the choice of lethal injection or electrocution, unlike the statute at issue in Washington v. Dowling, 92 Fla. 601, 109 So. 588 (1926), which changed the method of execution without preserving the method of execution effective when the defendant committed his offense. See Sims, 754 So.2d at 663-65. Thus, the trial court properly denied relief.
By retroactively applying the new statute allowing the choice between lethal injection and electrocution, death row inmates in Florida are assured that they will not be forced to suffer death by electrocution. The new lethal injection option allows what is generally viewed as a more humane method of execution.
With respect to issue five, we uphold the trial court's decision to deny relief on Bryan's claim that the State failed to disclose information about lethal injection which allegedly deprived him of the ability to make an informed decision regarding his choice of execution method. The trial court here agreed with the ruling of the trial court in Sims on the same issue:
All that is required is a general knowledge of the method of execution. A person cannot be said to be uninformed if hanging is the method of execution because he does not know the diameter of the rope or the length of the drop. Nor is a person uninformed about electrocution because he is ignorant of the voltage used. Lethal injection as a means of electrocution has been around for sufficient time for it to be generally known.
Sims, No. E78-363-CFA, slip op. at 11-12, quoted in Bryan v. State, No. 83-1-546, slip op. at 7 (Fla. 1st Cir.Ct. Feb. 18, 2000)(order on motion for rehearing). As mentioned above, this Court affirmed the trial court's order in Sims. Accordingly, because lethal injection is generally known as a method of execution, Bryan had sufficient information to make his decision; thus, the trial court properly denied relief.
As to issue six, this Court rejects Bryan's contention that the recent holding in Stephens v. State, 748 So.2d 1028 (Fla. 1999), which requires an independent de novo review of ineffective assistance of counsel claims, is applicable to his case. This Court rejected a like claim in Sims. In Sims' petition for writ of habeas corpus, he argued, among other things, that "this Court applied an incorrect standard in reviewing his ineffective assistance claim in its 1992 opinion. See Sims v. State, 602 So.2d 1253 (Fla.1992). Accordingly, he ask[ed] this Court to reconsider his ineffective assistance of counsel claims in light of the standard of review announced in Stephens." 754 So.2d at 670 n. 24. We reject the claim in line with our decision in Sims.
In his final issue presented to the Court, Bryan advances numerous constitutional challenges to the new lethal injection statute including that (1) the statute violates the separation of powers, (2) the legislature *1254 attempted to amend the Florida Constitution without following required procedures, (3) the statute violates the Florida constitutional prohibition against "special laws," and (4) the statute provides for a waiver that is not knowing and intelligent.

SEPARATION OF POWERS
Bryan argues that chapter 2000-2, section 2 of the Laws of Florida (amending, among other things, section 922.105, Florida Statutes (1999)) is unconstitutional because the legislature engages in constitutional interpretation, which is the exclusive domain of the judiciary. In short, the statutory provisions at issue provide that if one method of execution is found unconstitutional then an alternative method shall be used, the provisions of Malloy v. South Carolina, 237 U.S. 180, 35 S.Ct. 507, 59 L.Ed. 905 (1915), are adopted, and that a change in the method of execution does not change the punishment of death for capital murder. See ch.2000-2, § 2, Laws of Fla. Bryan's claim that these statutory provisions invade the judiciary's power is without merit as evidenced by this Court's recent review of the constitutionality of these provisions in Sims, wherein we found them constitutional, thus exercising this Court's power and duty to adjudicate conflicts arising from the interpretation or application of laws. See Commission on Ethics v. Sullivan, 489 So.2d 10, 13 (Fla. 1986).
Bryan further argues the amendments to sections 922.10 and 922.105, Florida Statutes, which add lethal injection as a method of execution, also violate the separation of powers doctrine in that the legislature unlawfully delegated its authority to the DOC. However, in Sims, this Court disposed of the unlawful delegation of power argument as follows:
We likewise conclude that the new law does not improperly delegate legislative authority to an administrative agency. Generally, the Legislature may not delegate the power to enact a law or the right to exercise unrestricted discretion in applying the law. See B.H. v. State, 645 So.2d 987, 991-92 (Fla.1994); Askew v. Cross Key Waterways, 372 So.2d 913, 924 (Fla.1978); State v. Atlantic Coast Line Railroad Co., 56 Fla. 617, 47 So. 969 (1908). However, the Legislature may "enact a law, complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose." Atlantic Coast Line Railroad Co., 56 Fla. at 636-37, 47 So. at 976.
Other courts have considered the separation of powers argument and rejected the same. See State v. Deputy, 644 A.2d 411 (Del.Super.Ct.1994); State v. Osborn, 102 Idaho 405, 631 P.2d 187 (1981); Ex parte Granviel, 561 S.W.2d 503 (Tex. Crim.App.1978).
754 So.2d at 668 (footnote omitted). Accordingly, because this Court retains its power to interpret and apply the instant statutes and because we recently rejected the unlawful delegation of legislative power argument in Sims, we hold that Bryan's claims regarding the separation of powers doctrine are without merit.

UNLAWFUL AMENDMENT TO THE CONSTITUTION
We also find without merit Bryan's assertion that in amending section 922.105 as mentioned above, the legislature unlawfully amended the Florida Constitution. Clearly, the legislature acted within its prerogative in providing for a method of carrying out a punishment under the criminal law, and in expressing its intention that the law be applied retroactively. See generally McKendry v. State, 641 So.2d 45, 47 (Fla.1994) (explaining that it is within the legislature's power to prescribe punishment for criminal offenses). To that end, the legislature's decision to create a choice as to methods of execution is just as *1255 valid as the legislature's prior determination that only one method of execution should be allowed, or that it was appropriate for Florida to change from hanging to electrocution. Thus, Bryan's argument as to an unlawful amendment to the Florida Constitution is without merit.

PROHIBITION AGAINST "SPECIAL LAWS"
This Court further finds that Bryan's claim that the legislature violated Florida's constitutional prohibition against "special laws" is unavailing. Article III, section 11 of the Florida Constitution provides that "[t]here shall be no special law or general law of local application pertaining to ... [the] punishment for crime." Art. III, § 11(a)(4), Fla. Const. However, in arguing that a change in the method of execution is a violation of article III, section 11(a)(4), Bryan overlooks our recent pronouncement in Sims:[7] "The new law does not affect the penalty for first-degree murder, which has remained the same (i.e., death). Further, the legislative switch to lethal injection merely changes the manner of imposing the sentence of death to a method that is arguably more humane." 754 So.2d at 665; see Malloy, 237 U.S. at 185, 35 S.Ct. 507 (holding that the "statute under consideration did not change the penaltydeathfor murder, but only the mode of producing this together with certain non-essential details in respect of surroundings. The punishment was not increased, and some of the odious features incident to the old method were abated"). Because the punishment for capital murder is the same now as it was before the recent modification of the execution statute, and because the new statute affects procedural aspects of selecting a method of execution rather than imposing a punishment, the new statute does not violate the prohibition against special laws.

KNOWING AND VOLUNTARY WAIVER
Bryan's argument that the new statute violates the constitutional requirement for a knowing and voluntary waiver of one's rights is without support given this Court's ruling thereon in Sims. Sims also argued that "the law may not presume that a method of execution has been waived merely by being silent"; however, the Court rejected the claim. See Sims, 754 So.2d at 664 n. 10. Federal courts have rejected related claims where defendants argued that having a choice as to execution methods constituted cruel and usual punishment. See Poland v. Stewart, 117 F.3d 1094, 1105 (9th Cir.1997) ("Poland need make no choice. If he says nothing, he will be executed by lethal injection. The mere existence of the option is not a violation of Poland's constitutional rights."), cert. denied, 523 U.S. 1082, 118 S.Ct. 1533, 140 L.Ed.2d 683 (1998); Campbell v. Wood, 18 F.3d 662, 688 (9th Cir.1994) ("We cannot say the State descends to inhuman depths by allowing the condemned to exercise... an election [of execution method]. We believe that benefits to prisoners who may choose to exercise the option and who may feel relieved that they can elect lethal injection outweigh the emotional costs to those who find the mere existence of an option objectionable.") (en banc). Similarly, we hold that the default mechanism in the instant case does not result in an unconstitutional waiver since the decision to affirmatively elect a preferred method or to simply default to lethal injection is completely within the control of the defendant.

CONCLUSION
Based on the above, the trial court's order denying relief is affirmed, Bryan's petition for extraordinary relief is denied, *1256 and his application for a stay of execution is denied.
It is so ordered.
HARDING, C.J., and SHAW, WELLS, LEWIS and QUINCE, JJ., concur.
ANSTEAD and PARIENTE, JJ., concur in result only.
NOTES
[1] The jury recommended death by a seven-to-five vote. The trial court imposed the recommended sentence after finding six aggravating and two mitigating circumstances. The aggravating circumstances were (1) Bryan's previous conviction for a violent felony; (2) commission of the murder during a kidnapping and robbery; (3) commission to avoid arrest; (4) commission for pecuniary gain; (5) the heinous, atrocious, and cruel nature of the murder, and the (6) cold, calculated, and premeditated nature of the murder. The mitigating circumstances were (1) Bryan had a good work record, and (2) he was law abiding for one year after escaping from a county jail. See Bryan v. State, 748 So.2d 1003 (Fla.1999).
[2] In Strickland, the United States Supreme Court established a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
466 U.S. at 687, 104 S.Ct. 2052. With respect to prejudice, the Court elaborated that the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. "[T]he question is whether there is a reasonable probability that, absent the errors, the sentencerincluding an appellate court ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S.Ct. 2052.
[3] Furthermore, Bryan challenged the effectiveness of Stokes' representation before the federal trial and appellate courts, both of which denied relief. The federal district court expressly held that Stokes' penaltyphase performance was not deficient and, in the alternative, even if counsel was deficient, there was no prejudice. See Bryan v. Singletary, No. 94-30327 (N.D.Fla. July 7, 1996)(unpublished order). The federal trial court also rejected claims of guilt-phase and appellate ineffectiveness of counsel. See id. On review, the court of appeals focused on Bryan's claim of sentencing-phase ineffectiveness and held that "[b]ecause Bryan cannot satisfy the prejudice prong, we need not address the performance prong" under Strickland. Bryan v. Singletary, 140 F.3d 1354, 1357 (11th Cir. 1998), cert. denied, 525 U.S. 1159, 119 S.Ct. 1068, 143 L.Ed.2d 72 (1999). The court explained that in the face of strong aggravating circumstances, "the failure to present psychiatric testimony may not be prejudicial to the defendant, especially so in this case where the substance of Bryan's health problems was in fact before the jury, and where conclusions of experts which Bryan now proffers are inconsistent with Bryan's actions in implementing a complicated murder scheme and his elaborate attempts to cover his tracks." Id. at 1360.
[4] Note, however, that in its order denying rehearing, the trial court stated that "[a]s suggested by defense counsel ... the Court conducted an in camera review of Mr. Stokes' substance abuse treatment records for 1988 and 1990." The court explained that "these records do not contain any records to objectively document Bryan's claim that Mr. Stokes was ineffective during the times at issue. Neither these documents nor [additional affidavits submitted by Bryan] contain any specific evidence of substance abuse or dependency that impaired Mr. Stokes' `actual conduct at trial.'"
[5] Bryan attempts to raise the same argument regarding Stokes' alleged ineffectiveness when he argues that Stokes had an actual conflict of interest with him based on Stokes' alcoholism. Further, Bryan attacks Stokes' credibility based on Stokes' alleged representation to Bryan's postconviction counsel that he did not have a substance abuse problem. Bryan also alleges that the trial court engaged in an ex parte communication with Stokes regarding treatment records. We consider all of these claims to be derivative of the central question dealing with Stokes' effectiveness at trial which, as explained above, we have found to be effective. The Court therefore denies relief based on these claims.
[6] Bryan also attacks section 945.10 under article II, section 3 of the Florida Constitution, which provides that the "powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." Art. II, § 3, Fla. Const. This argument is misplaced since the DOC is acting as a litigant by claiming a statutory exemption to a disclosure requirement; contrary to Bryan's argument, the DOC is not promulgating regulations on disclosure exemptions. Thus, whether the DOC is properly claiming an exemption is properly examined pursuant to an analysis under article I, section 24(c).
[7] A special law is statute pertaining to "particular persons or things or other particular subjects of a class." Housing Auth. of the City of St. Petersburg v. City of St. Petersburg, 287 So.2d 307, 310 (Fla.1973). In our analysis of this issue we assume for the sake of argument, and do not actually find, that this test is satisfied.